Argued and submitted July 30, 2010, affirmed June 15, petition for review denied September 15, 2011 (350 Or 716)

Geoffery E. NEFF
and Peggy Neff,
husband and wife,
*Plaintiffs-Appellants,*

*v.*

SANDTRAX, INC.,
an Oregon corporation;
H. Richard Burkholder;
S. Jean Burkholder;
Richard J. Burkholder;
and Tonya A. Burkholder,
*Defendants-Respondents.*

Coos County Circuit Court
08CV0610; A142518

259 P3d 985

Roger Gould argued the cause for appellants. With him on the brief was Gould Law Firm, P.C.

William A. McDaniel argued the cause for respondents. With him on the brief was Whitty, Littlefield, McDaniel & Bodkin, LLP.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

ORTEGA, P. J.

.

## ORTEGA, P. J.

Plaintiffs appeal from a judgment regarding the boundary between their parcel and defendants' parcel. The boundary dispute arises from the existence of two possible locations for a section corner: the "BLM corner" or the "Buckingham corner."[1] The boundary between plaintiffs' and defendants' parcels depends on the corner's location, resulting in a disputed area of .12 acres. Finding for defendants on their affirmative defense of estoppel, the trial court declared that the boundary is determined by reference to the BLM corner. We review the trial court's legal conclusions for errors of law, and we are bound by its factual findings if there is any evidence to support them.[2] *State v. S. T. S.*, 236 Or App 646, 654-55, 238 P3d 53 (2010). For the reasons set forth below, we affirm.

Plaintiffs and defendants bought their respective parcels from a common grantor, Neifert.[3] Together, the parcels comprise a thin strip of land bounded generally by old US Highway 101 on one side and by railroad property on the other. When Neifert bought what is now defendants' parcel, the previous owner showed him some flags and indicated that they marked the boundary between the two parcels.[4] A

---

[1] The BLM corner was established by the predecessor to the Bureau of Land Management in the late 1800s and was rediscovered in 1981. The Buckingham corner was established in 1937, when the BLM corner could not be found, and later reestablished by the county surveyor. A discussion of surveying principles is not necessary to our disposition of this appeal. For an explanation of the terminology and history of surveying in Oregon, *see Dykes v. Arnold*, 204 Or App 154, 129 P3d 257 (2006).

[2] Portions of this case are equitable in nature. *See, e.g., Summers v. Holder*, 254 Or 180, 184, 458 P2d 429 (1969) (reviewing *de novo* where the plaintiffs sought injunctive relief and the defendants raised the affirmative defense of estoppel); *Brunswick v. Rundell*, 126 Or App 582, 585, 869 P2d 886 (1994) (although ejectment is an action at law, equitable counterclaims require *de novo* review). The notice of appeal was filed after the effective date of amendments to ORS 19.415 that make *de novo* review discretionary here, Or Laws 2009, ch 231, § 3, and plaintiffs made no request for *de novo* review. *See* ORAP 5.40(8) (concerning requests for *de novo* review in cases where such review is discretionary with the Court of Appeals).

[3] For convenience, we refer to "defendants' parcel," although the parcel is owned by the individual defendants, who also own defendant Sandtrax, Inc.

[4] The flags were placed by Troy Rambo, who testified that, in 2002, he performed a hand-compass survey, using BLM monuments, and placed flags on the boundary at the request of a potential buyer who wanted to see the property line.

few years later, Neifert bought what is now plaintiffs' parcel. Consequently, he owned both parcels involved in this litigation.

Defendants bought their parcel from Neifert the following year. The purchase included a residence (where the individual defendants live), a business, outbuildings, and a parking lot. When defendants were considering that purchase, Neifert walked the property with them, showing them the line that he had been shown, and told them that it was the boundary. Neifert intended for defendants to rely on his representation.

Defendant Richard Burkholder testified that he and his codefendants believed Neifert's representation and that "we all relied on that as being the boundary." On cross-examination, Burkholder acknowledged some uncertainty about whether he might still have purchased the property without the disputed area:

"Q. * * * [I]f you had known that the boundary line was actually at the edge of the pavement, you wouldn't have bought[ ] any of this, would you?

"A. Not necessarily.

"Q. You mean you would have?

"A. At the time we did not even know about that line, or know that it was there. And at the time, we never even thought about it. So, I don't know what our decision would have been. I don't—I can't speak for the other three owners.

"Q. Well, you're saying that you relied upon learning that the boundary was up on the hill in your decision to buy. In truth, you would have bought[ ] it even if you knew that—had learned that the line was at the edge of the pavement, wouldn't you?

"A. There's a possibility, yes."

Burkholder was not asked whether he would have agreed to the same purchase terms if he had been told that the boundary was in a different place. On redirect, he testified that defendants bought the land expecting to receive everything up to the line identified by Neifert and thought that that was part of the deal. After purchasing the property, defendants

used the disputed area to test buggies and ATVs used in their business.

Defendants hired Troy Rambo to survey and mark the boundary and place stakes for fence construction. Rambo, using the BLM corner, placed the boundary line in about the same position as the original flagging. Defendants then began building a fence a few inches on their side of that surveyed line.

Soon afterward, plaintiffs bought their parcel. When they first looked at the property, flags marked the line where the fence is now located, and the fence was partly built. There was no visible indication of a different boundary line. Plaintiff Geoffery Neff testified that he assumed that defendants thought that the boundary was at the same location as the fence. Before completing the purchase, however, plaintiffs learned of potential problems with the boundary between their parcel and defendants' parcel. Plaintiffs had a survey done by Jerry Estabrook, who noted the existence of two locations for the section corner. Estabrook believed that the Buckingham corner was the proper reference point for the boundary between plaintiffs' and defendants' parcels. According to Estabrook, the original legal description of defendants' parcel was based on a 1948 survey that used the Buckingham corner, and defendants' deed uses that same legal description. Based on Estabrook's survey, plaintiffs agreed to buy the property.[5]

Plaintiffs negotiated a $33,000 decrease in the sale price for their parcel, based on questions about the boundary. Plaintiffs believed the boundary with defendants' parcel to be the only problematic boundary. Neifert, for his part, understood the boundary with defendants' parcel to be the marked line, and he did not perceive any problem with that boundary. Rather, he suspected a problem with a different boundary. He agreed to a price reduction because he believed that the parcel's actual size might be less than had been listed.

---

[5] Estabrook prepared a survey map—dated a few weeks after plaintiffs' deed from Neifert—depicting the disputed area. The narrative on the map states that "[t]he purpose of this survey was to delineate the two possible locations of the west boundary line of [plaintiffs' parcel], depending on which section corner and which record monuments are held to define said boundary line." (Uppercase omitted.)

Subsequently, plaintiffs filed this action seeking a declaration that they are the owners of the property at issue, as well as an injunction prohibiting defendants from asserting any claim to the property. Defendants prevailed on an affirmative defense of boundary by estoppel.[6] The trial court reasoned that Neifert would be estopped from asserting a different boundary given that he represented to defendants that the boundary was where the BLM corner places it, defendants bought their parcel based on that representation, and they then used the disputed property as their own. The court further reasoned that plaintiffs were on inquiry notice of that estoppel as a result of their knowledge that that boundary line was marked by some flags and a partially built fence, that there were questions about the location of the boundary and the size of the parcel, that defendants claimed the disputed area as their own, and that Neifert did not know the size of the parcel that he was selling. The trial court concluded that, under the circumstances, a reasonable and prudent person would have inquired of Neifert or defendants about the basis for defendants' belief that the fence was on the boundary; such an inquiry would have led "to the information that Neifert had represented and defendants had understood that the boundary was located where the flags marked a line and the construction of the fence had been started representing the boundary."

Plaintiffs appeal. They contend that the trial court erred in finding that defendants were entitled to prevail on their affirmative defense of boundary by estoppel. According to plaintiffs, Neifert would not be estopped because defendants failed to show that they relied on his representation in deciding to buy their parcel. Plaintiffs also contend that a mistake, by itself, cannot form the basis for estoppel regarding the location of a boundary. Furthermore, plaintiffs argue, they are not estopped, because they made no representation to defendants and they had neither actual nor inquiry notice of Neifert's representation. In their view, they adequately inquired by having Estabrook perform a survey: "such

---

[6] The court rejected defendants' other affirmative defense, boundary by agreement. *See Blaisdell v. Nelsen*, 66 Or App 511, 514, 674 P2d 1208 (1984) (describing the elements of boundary by agreement). Defendants do not cross-assign error to that ruling.

inquiry led plaintiffs to know that defendants were mistaken on their belief of the location of the line. And if defendants' understanding of where the line was located came from Neifert, he, too, was mistaken."

Defendants respond that they did, in fact, rely on Neifert's representation in purchasing their parcel and using the disputed area in their business. They further argue that plaintiffs had a "duty to make inquiry as to why the defendants were in possession of the disputed property and why they were claiming to be its owner. Had they done so, by either inquiring of the Neiferts or the defendants, they would have had actual knowledge of * * * Neifert's representations." We agree with defendants, and with the trial court, that Neifert would be estopped from denying that the boundary was where he represented it to be and that plaintiffs were bound by Neifert's representation.

Where a seller represents a particular line to be the boundary between the property that he is selling and the property that he is retaining and he induces a buyer to buy up to the purported boundary, the seller is estopped from later denying the accuracy of his representation of the boundary. *Clark v. Hindman*, 46 Or 67, 79 P 56 (1905). In *Clark*, the plaintiff had bought land from her father, who identified a particular line as the boundary between her property and his remaining property and built a fence on that line. The plaintiff paid to have a house built on a site that was selected by her father, who supervised the construction of the house, which turned out to encroach over the boundary described in the deed. *Id*. at 71-73. The issue was whether the father's acts estopped him and his wife, to whom he had transferred the remaining property, from asserting the boundary described in the deed. *Id*. at 74. Concluding that the father and his wife were so estopped, the court explained that a party

> " 'is estopped to deny the line between his own and the adjoining land to be the true line if he has sold and conveyed land up to such line, has pointed it out as the true line, and has induced the defendant to purchase up to such line.' : 2 Hermann, Estoppel, § 1133."

*Id*. at 75. Because the father, in ignorance of his ownership of the land, had encouraged the plaintiff to incur expenses to

build her house, he and his wife were estopped from asserting their title to the injury of the plaintiff. *Id.*

The same rule was applied in *Reisland v. Schick et al.*, 111 Or 42, 224 P 827 (1924). There, when the defendants bought their land and house, the plaintiff acted as the grantor's agent in the sale. A well-defined line lay between the lot that the defendants bought and the neighboring lot, and that line appeared to be the boundary. The plaintiff showed the defendants the apparent line and told them that a survey was unnecessary because he knew that the property extended to that line. The defendants bought their lot, intending to live in the house. The plaintiff later bought the neighboring lot and house from the same grantor. As it turned out, the apparent line between the plaintiff's and the defendants' lots was more than 22 feet away from the true boundary, which ran through the house that the defendants purchased. *Id.* at 44-45. When the plaintiff learned that his house was located, in part, on land belonging to others, he bought that strip of land and then demanded that the defendants buy from him the strip of his lot onto which their house encroached. *Id.* at 45-56. The court concluded that the plaintiff was estopped from asserting the true boundary:

> "Where the owner of two adjoining tracts of land, or his agent, acting within the scope of his authority, points out to another what he represents to be the boundary line between the two tracts of land in order to induce the other to purchase one of said tracts, and makes a positive statement that he knows, of his own knowledge, that the line pointed out by him is the true boundary line between the two tracts, and the other party is ignorant of where the true line is and alters his position by purchasing the property in reliance upon said representation, believing that the property he is purchasing extends to that line, such owner, and his privies in estate in the other tract, if it turns out that the line pointed out is not the true boundary line between the two tracts, will be forever precluded and estopped to allege or claim that the premises which they induced the other to purchase, in reliance upon said representation, do not include all of the land up to said line."

*Reisland*, 111 Or at 49.

Here, there is no dispute that Neifert, the common grantor of defendants' and plaintiffs' parcels, represented to defendants that the boundary was on a marked line. Neifert acknowledged that he intended for defendants to rely on that representation, and defendant Richard Burkholder testified that the individual defendants believed Neifert and bought their parcel with the expectation that they had purchased everything up to that line. The trial court found that defendants bought their parcel in reliance on Neifert's representation. Although plaintiffs argue that defendants did not rely on that representation, there is evidence in the record that supports the trial court's finding, and we are bound by it. This case, therefore, falls squarely within the rule applied in *Clark* and *Reisland*.

Plaintiffs next contend that Neifert could not be estopped, because he was simply mistaken about the location of the boundary. Relying on *Talbot v. Smith*, 56 Or 117, 107 P 480, *on reh'g*, 108 P 125 (1910), plaintiffs argue that a mistake cannot give rise to an estoppel. *Talbot*, however, involved circumstances that are distinguishable. There, the plaintiff conceded that the descriptions in her neighbors' deeds included the disputed land, but she argued that the neighbors were estopped from claiming the land because they had built a fence on the line claimed by the plaintiff. The court rejected the plaintiff's argument, reasoning that any mistake by the neighbors in the placement of their fence did not, in the absence of adverse possession by the plaintiff, preclude the neighbors from claiming the land outside the fence. 56 Or at 123. The facts in *Talbot*, however, do not describe circumstances in which the neighbors sold the plaintiff her property or made any representation to induce any action by her.

Further, *Talbot* does not suggest that a party, after making a representation giving rise to an estoppel, is excused from the effects of the representation if that representation was made with a belief in its accuracy. Indeed, plaintiffs' argument here cannot be squared with *Clark* and *Reisland*, each of which involved a misrepresentation arising from ignorance of the truth. *Clark*, 46 Or at 74 (noting that the

father's acts were "performed in ignorance of the true location of the southwest corner of his block, and his representations in relation to the supposed east boundary of plaintiff's land, [were] made without intent to deceive [plaintiff]"); *Reisland*, 111 Or at 47 (where the plaintiff represented to the defendants that he personally knew where the boundary was, but he actually did not know, "his representation thus recklessly and negligently made was, in law, as much a false and fraudulent representation as if, knowing where the true boundary line was, he falsely represented it to be elsewhere"). Accordingly, we reject plaintiffs' argument that Neifert would not be estopped from denying that the boundary was where he represented it to be.

We turn to plaintiffs' arguments that they are not bound by Neifert's representations. In the analogous context of boundary by agreement, we have held that an agreement is "binding on the parties' successors in interest, as long as they have actual or constructive notice of it." *Eidman v. Goldsmith*, 149 Or App 7, 14, 941 P2d 1045, *rev den*, 326 Or 62 (1997) (citations omitted); *see also Clark*, 46 Or at 76 (estoppel applies to the person who made the representation and to those in privity with him). A purchaser has constructive notice of a claim to property if, with reasonable observation and intelligence, he should have had notice of the claim at the time he purchased; whether or not the inquiry actually is made, the purchaser is charged with notice of every fact that a reasonable inquiry would have disclosed. *Vandehey Development Co. v. Suarez*, 108 Or App 154, 157, 814 P2d 1094, *rev den*, 312 Or 235 (1991). Furthermore, "the possession of persons other than the grantor will put a purchaser upon inquiry as to the possessor's interest." *Webb v. Stewart*, 255 Or 523, 536, 469 P2d 609 (1970) (footnote omitted).

Here, plaintiffs bought their parcel knowing that defendants were building a fence on a line that did not correspond to what plaintiffs believed to be the boundary, and plaintiffs actually believed that defendants claimed the land up to the fence line. Plaintiffs had a survey done, which revealed the different locations of the boundary depending on whether the BLM corner or the Buckingham corner was used. Plaintiffs negotiated a lower price because of questions about the boundary, but they did not inquire of defendants or

Neifert about the basis for defendants' belief that the fence was on the boundary—an inquiry that would have led them to information about Neifert's representation to defendants about the boundary's location. Instead, plaintiffs appear to have assumed, without inquiring further, that defendants were simply wrong about the location of the boundary. Because plaintiffs had inquiry notice of Neifert's representation to defendants, they are bound by that representation. The trial court did not err in finding for defendants on their affirmative defense of estoppel and establishing the boundary between plaintiffs' and defendants' parcels accordingly.

Affirmed.